UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 10-274 CAS | | | | Date | February 27, 2012 |
|---|---|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | | | |
| Interpreter | (SPANISH) - LUIS RODRIGUEZ-VILLA | | | | | |
| CATHERINE JEANG | LAURA ELIAS | | | | PETER BALDWIN RUPA GOSWAMI | |
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | | | | *Assistant U.S. Attorney* | |
| Defendant | Present | Cust. | Bond | Attorneys: | Present | App. Ret. |
| Abelardo Salceda | X | X | | Jill Ginstling Nikoo Berenji | X X | |

| Proceedings: | **GOVERNMENT'S MOTIONS *IN LIMINE*** (filed 10/24/2011) **DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** (filed 10/26/2011) **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS** (filed 11/21/2011) |
|---|---|

## I.  INTRODUCTION & FACTUAL BACKGROUND

Defendant Abelardo Salceda ("defendant") is charged in a Superceding Indictment with two counts of possession of child pornography in violation of 18 U.S.C. § 2252(a)(5)(B).

On March 10, 2009, Magistrate Judge Oswald Parada issued a warrant authorizing the search of defendant's home as well as the seizure of any digital media devices therein. See Dkt. No. 36-2, Exh. A.  The warrant authorized a forensic search of the seized digital media to be completed within 60 days for specific evidence relating to the offenses of receiving and possessing child pornography.  See id.

On March 18, 2009, Immigration and Customs Enforcement ("ICE") agents executed the search warrant.  At approximately 7:00 a.m., eight ICE agents outfitted in tactical gear, supported by a Riverside Sheriff's Department helicopter and a Riverside Sheriff's Deputy, approached defendant's home.  See Declaration of ICE Special Agent ("SA") Victor Dominguez ("Dominguez Decl.") ¶¶ 4–5.  Defendant's home sits atop a hillside and is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CRIMINAL MINUTES - GENERAL

accessible by only a narrow, winding driveway. Id. ¶ 4. Because there are no other access points to the property, the officers' vehicles blocked the thoroughway. After arriving at the house, ICE agents escorted defendant and his common-law wife, Olivia Castillo ("Castillo"), outside in order to conduct a protective sweep of the premises. Id. ¶ 7. The officers ordered them to stand facing an outside wall with their hands against the wall. Declaration of Olivia Castillo ("Castillo Decl."), ¶ 5. Officers pointed guns at the couple and patted them down and sprayed gas on the couple's dogs. Id. ¶ 6. Castillo was ultimately permitted to retrieve the couple's two-year-old daughter from within after approximately 40 minutes had elapsed and the officers had finished their protective sweep. Id. ¶ 8, Dominguez Decl. ¶ 8. Defendant, Castillo, and their daughter where then escorted back inside the house at which point ICE agents separated defendant from his family and directed him to a spare room on the first floor of the home. Id. ¶¶ 10–12. Castillo was monitored by a female officer and was not allowed to move around the house without the officer accompanying her, including to the restroom. Castillo Decl. ¶ 10.

Agents Negrelli and Dominguez, the only other two people in the room with defendant, identified themselves as law enforcement officers and expressly told defendant he was not under arrest. See Transcript of 3/18/2009 interview (hereinafter "Transcript"), attached to defendant's motion as Exh. B at 1:7–15. The following exchange occurred between SA Negrelli and defendant:

> SA Negrelli: Okay. You're not under arrest. You're not going to jail?
>
> Defendant. Uh-huh.
>
> SA Negrelli: Okay? Unless you decide to fight me, we're going to leave your house and you're going to go on with your life. Do you understand that?
>
> Defendant: If I decide to fight?
>
> SA Negrelli: If you fight me—
>
> Defendant: Oh.
>
> SA Negrelli: —then you go to jail.
>
> Defendant: Okay.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

SA Negrelli:   Okay?  If you don't fight, you don't go to jail.

Defendant:   Okay.

Id. at 1:13–2:2.

    Following that exchange, and prior to asking defendant any substantive questions, SA Negrelli informed defendant of his Miranda rights in English.[1]  Defendant orally acknowledged that he understood these rights and signed an English-language form indicating he had been informed of his rights and further waiving those rights.  Id. at 3:6–8; Exh. C to defendant's motion.  SA Negrelli then asked defendant if he wished to have his rights read to him in Spanish.  Transcript at 3:12–15.  Defendant indicated that he did, so SA Dominguez summarized defendant's Miranda rights in Spanish.  Id. at 3:16–4:14.  Defendant again orally stated that he understood his rights and he signed a Spanish-language form indicating that he had been read and understood his rights.  Id. at 5:20–22; Exh. D to defendant's motion.  SA Negrelli then asked defendant: "Do you agree to have a conversation with me?" to which defendant responded, "Yeah."  Transcript at 6:25–7:2.

    SA Negrelli and SA Dominguez spoke with defendant for approximately one hour during which defendant admitted that he possessed and viewed child pornography on computers that were found in his house during the execution of the search warrant.  Id. at 38:18–25; 42:3–9; 51:20–52:4; 57:14–25; 60:17–21.  Defendant also admitted to purchasing an online subscription to a child pornography website, and acknowledged that he had saved certain digital files containing child pornography and printed out hard copies of child pornography.  Id. at 42:34–35; 45:3–7; 58:9; 65:2–7.  At one point during the questioning, defendant asked whether he should retain an attorney.  Id. at 52:3–4.  The agents told defendant he was entitled to an attorney if he requested one.  SA Negrelli stated: "If you're telling me 'I want a lawyer,' I'm done.  If you want to talk, that's okay too.  But if say, 'Abogado now,' I'm done.  Then I have no more questions."  Id. at 52:21–24.  Defendant did not request an attorney at that point or any point thereafter.  Following the questioning, defendant led agents to a locked safe in his garage and unlocked it for them.  Dominguez Decl. ¶ 22.  The safe harbored CDs later found to contain photographs and videos of child pornography, as well as several printouts depicting child pornography.  Id.  Defendant now seeks to suppress all statements made to SAs Negrelli and

---

[1] The parties do not dispute that SA Negrelli adequately informed defendant of his rights as required by Miranda.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966) (requiring officers to inform defendants of their right to remain silent, right to consult with an attorney before answering any questions, and right to cease questioning at any time).

Dominguez on the ground that his Miranda waiver was coerced. Defendant also seeks to suppress the evidence from the safe as "fruit of the poisonous tree."

On May 12, 2011, more than two years after the first search warrant had expired, the government applied for a second warrant to conduct a more complete search of the digital media seized from defendant's home. See Dkt. No. 36-3, Exh. B. Magistrate Judge Ralph Zarefsky denied the second warrant application, stating orally that "if it was determined that the requested analysis was not permitted under the First Search Warrant, there was no new evidence giving rise to probable cause to issue a second search warrant." Dkt. No. 38 at 6. The government thereafter filed an ex parte application with this Court, requesting an order permitting the search for which Judge Zarefsky declined to issue the second warrant. Dkt. No. 36. On August 11, 2011, the Court denied the government's application, finding that: (1) to the extent the application sought permission to engage in searches not authorized by the original warrant, the ex parte was a procedurally improper request for reconsideration of Judge Zarefsky's denial of the government's application for a second search warrant; and (2) to the extent the government sought clarification of the original warrant, it would be more prudent to seek it from the issuing judge, Judge Parada. See generally Dkt. No. 39. The government did not seek clarification from Judge Parada but instead determined that its new forensic search was authorized by the original warrant. The government therefore executed additional forensic analysis in September and October 2011. These "new" searches produced several hundred pages of forensic reports in addition to the considerable material gathered during the initial search. Defendant seeks to suppress all evidence obtained during the searches of defendant's digital media in September and October 2011.

## II.     DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant argues that the waiver of his Miranda rights was involuntary and coerced. Def. Mot. to Suppress Stmts ("11/21/11 Mot") at 7. First, defendant contends that he was in custody for Miranda purposes. Id. at 8–12 (relying on United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008)). Second, defendant argues that his Miranda waiver was involuntary because SA Negrelli's "very first statements" to defendant—that "[i]f you fight me . . . then you go to jail"—served "no legitimate purpose but to coerce [defendant] to speak." Id. at 14. This threat, according to defendant, was sufficient to overcome his will given the "frightening" circumstances surrounding the search and interrogation. Id. at 14–15. Finally, defendant argues that his statements were involuntary under the due process clause for the same reasons his Miranda waiver was allegedly involuntary. Id. at 16–17. As a result, defendant seeks to suppress not only the statements made by defendant, but the evidence from the locked safe as "fruit of the poisonous tree." Id. at 17–18.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

In opposition, the government argues that defendant was not "in custody" for the purposes of Miranda. Gov't Opp'n to 11/21/11 Mot. ("12/5/11 Opp'n") at 9–16. First, the government notes that defendant was "explicitly told that he was not under arrest." Id. at 10. Second, the government argues that defendant "was never restrained in a manner that would suggest he was not free to end the encounter." Id. at 11–12. Third, the government contends that defendant was not "in custody" because he was interviewed in his own home. Id. at 13–15. Thus, according to the government, "the totality of the circumstances shows defendant was not in custody." Id. at 16. Assuming defendant was in custody, the government contends that his Miranda waiver was voluntary because he was read his rights in both English and Spanish and acknowledged that he understood his rights both orally and in writing. Id. at 17. The government disputes defendant's contention that SA Negrelli "threatened" defendant when he stated defendant might face jail time if he "fought" him: "the only sensible interpretation of SA Negrelli's comment—given its context in the conversation—is that SA Negrelli was telling defendant the only way that he would go to jail on that day was if he chose to physically assault an officer. . . ." Id. at 19 (emphasis in original). The government argues there is no due process problem because "defendant's interview took place in an open room in his own home. The tone of the interview was conversational and relaxed. The ICE agents never raised their voices, and they never were confrontational towards defendant." Id. at 21–22. Finally, the government argues that even if there was a Miranda violation, the evidence discovered in the safe should not be suppressed because "it would inevitably have been discovered through independent, lawful means." Id. at 23–24.

The Court finds that defendant was in custody for the purposes of Miranda. "In determining whether a person is in custody . . . the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 565 U.S. ---, Slip. Op. No. 10-680 at 8 (2012) (internal quotation marks and citations omitted). "And in order to determine how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation." Id. (internal quotation marks, citations, and alterations omitted). In Craighead, the Ninth Circuit explored, as a matter of first impression, how interrogations at a defendant's home affects the Miranda framework. The court first noted that one's home is "the most constitutionally protected place on earth. To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." 539 F.3d at 1083. Thus, the Ninth Circuit articulated a new rule in which courts must "consider[] the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" Id. The court announced several factors relevant to this analysis, including:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

Id. at 1084.

The first three factors weigh in favor of finding that defendant was in custody for purposes of Miranda in this case. First, there were eight armed ICE agents and two additional local police escorts executing the search warrant at defendant's home. "[T]he presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated environment." Id. at 1085 (finding that eight law enforcement officers constituted a "large number" of officers). Second, although defendant was never physically restrained by the officers, he and his wife were monitored and escorted throughout their home during the duration of the agents' search. See id. ("Restraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times."). As the Ninth Circuit explained:

> We understand that in many cases, when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will be necessary to preserve the evidence and protect the safety of the agents. The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody.

Id. at 1086.

Third, defendant was isolated from his wife and child prior to being interrogated. This is "perhaps the crucial factor" in determining whether a defendant was in custody for purposes of Miranda, because "[a] frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter the suspect from making inculpatory statements." Id. at 1086–87 (internal quotation marks and citation omitted). Indeed, Miranda itself noted that the law enforcement technique of isolating a suspect prior to interrogation is one of the distinguishing features of a custodial interrogation. Miranda, 384 U.S. at 445–46. The fourth factor, whether defendant was informed that he was free to leave, weighs against a finding that defendant was in custody. SA Negrelli explicitly told defendant he was not under arrest. Although such a statement may "reduce[] the chance that a suspect will reasonably believe in

custody," the totality of the circumstances weighs in favor of finding that defendant was in custody for purpose s of Miranda. Craighead, 539 F.3d at 1087–89 (holding, under totality of the circumstances, that the defendant was in custody for purposes of Miranda despite statements from law enforcement officers that the suspect was not under arrest, that statements were voluntary, and that he was free to leave at any time).

Because the Court finds that defendant was in custody for purposes of Miranda, the next inquiry is whether defendant's purported waiver of his rights was voluntary. If the waiver is deemed voluntary, the Court must then assess whether the statements themselves were given voluntarily. For the reasons set forth below, the Court finds that defendant's waiver and subsequent statements were both voluntarily made.

Before the government may introduce a defendant's custodial, incriminating statements, it must prove that the defendant voluntarily, knowingly, and intelligently waived his rights. Miranda, 384 U.S. at 475; Colorado v. Spring, 479 U.S. 564, 573 (1987); Derrick v. Patterson, 924 F.2d 813, 820 (9th Cir. 1990) (noting that a court must also find that the defendant understood his rights). When a defendant challenges a Miranda waiver, the government need only prove waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986). Whether or not a waiver is valid is based on the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). Factors commonly considered by courts when determining waiver of Miranda rights include, but are not limited to, the suspect's intelligence, age, and physical and mental condition. Courts also consider the explicitness of any Miranda waiver. See e.g., United States v. Rodriguez-Rodriguez, 393 F.3d 849, 855 (9th Cir. 2005) (waiver voluntary in part because the defendant signed a written waiver and Miranda rights were read to defendant in both English and Spanish). A signed Miranda waiver form is "usually strong proof" that a suspect voluntarily waived his rights, although it is not conclusive. North Carolina v. Butler, 441 U.S. 369, 373 (1979).

Here, the Court finds that defendant voluntarily waived his Miranda rights. Even crediting defendant's interpretation that SA Negrelli's statement that "if you fight me, then you go to jail" was intended to mean defendant would go to jail if he did not cooperate with the officers' questioning, the totality of the circumstances nonetheless demonstrate a voluntary waiver. First, officers read defendant his Miranda rights in both English and in his native Spanish. Defendant acknowledged orally that he understood those rights, and signed two forms (one in English, one in Spanish) indicating he had been read his rights and understood them. See United States v. Shi, 525 F.3d 709, 730 (9th Cir. 2008) (holding that Miranda waiver was voluntary, in part, because warnings were given to suspect in native language); Rodriguez-

Rodriguez, 393 F.3d at 855 (waiver valid in part because the defendant signed a written waiver and Miranda rights were read to defendant in both English and Spanish); United States v. Amano, 229 F.3d 801, 805 (9th Cir. 2000) (same).  Moreover, the signed English language form contained a waiver of defendant's rights.  Butler, 441 U.S. at 373 (holding that a signed Miranda waiver form is "usually strong proof" that a suspect voluntarily waived his rights).  After defendant signed the written waiver of his rights, SA Negrelli took the additional step of asking defendant twice if he wanted to speak to the officers, to which defendant responded "yeah" and then "okay."  Transcript at 6:25–7:4.  Defendant was not handcuffed during this time, and the officers' tone of voice was casual and non-threatening.  See Dickerson, 530 U.S. at 434 (totality of the circumstances inquiry includes the "details of the interrogation").  Finally, defendant attended one year of college and is not alleged to suffer from any mental infirmaries.  See Schneckloth, 412 U.S. at 226 (holding that courts may consider level of education in determining voluntariness).[2]  In light of the totality of the circumstances, the Court concludes that the government has shown by a preponderance of the evidence that defendant's Miranda waiver was made voluntarily.

   Because the Court concludes that defendant knowingly and voluntarily waived his Miranda rights, the next inquiry is whether his inculpatory statements were voluntary.  "A confession accompanied by physical violence is per se involuntary, while one accompanied by psychological coercion is not."  United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003).  The "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary.  The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired."  United States v. Byers, 649 F.3d 197, 215 (4th Cir. 2011); see also United States. V. Farley, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Unlike physical violence or the threat of it, which makes any resulting statement per se involuntary, the effect of psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case."); Schneckloth, 412 U.S. at 224–26 (holding there is no "talismanic definition" of voluntariness, and that the "ultimate test" boils down to whether the confession is "the product of an essentially free and unconstrained choice"); Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) ("Coercion can be mental or physical, but to render a statement involuntary, coercion must exist to such a degree that the statement is not 'the product of an

---

   [2]The mere fact that defendant has no prior criminal history and is allegedly unfamiliar with American criminal procedure does not change that his waiver was voluntary.  See Shi, 525 F.3d at 730 (holding that a foreign national's inexperience with the United States criminal justice system and his lack of contact with the consulate did not render his Miranda waiver involuntary).

essentially free and unconstrained choice by its maker.'") (quoting Schneckloth, 412 U.S. at 225); Miller, 984 F.2d at 1031 ("The pivotal question in each case is whether the defendant's will was overborne when the defendant confessed . . . [a]s long as the decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.") (internal quotation marks, citation, and alterations omitted). "[I]n psychological coercion cases . . . we look to the totality of the circumstances surrounding a confession." Haswood, 350 F.3d at 1031; United States v. Miller, 984 F.2d 1028, 1031 (9th Cir.1993) ("In psychological coercion cases, we must consider the totality of the circumstances involved and their effect upon the will of the defendant."); see also Muniz v. Johnson, 132 F.3d 214 (5th Cir. 1998) (holding that a defendant who alleges that his confession was coerced must show that but for police coercion he would not have given confession).

In this case, the totality of the circumstances demonstrate that defendant made his inculpatory statements voluntarily. For the reasons set forth above, the Court is unpersuaded that SA Negrelli's statements that defendant would go to jail if he "fought" him rendered any subsequent statements involuntary. To the contrary, it is clear from the context that defendant's statements were "the product of an essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225. Only two agents interviewed defendant, and they did so in defendant's own house without handcuffing him. See United States v. Ross, 510 F.3d 702, 710 (7th Cir. 2007) (upholding district court's determination of voluntariness because "only two inspectors interviewed [the suspect] at any given time, and . . . when [he] gave his confession, he was sitting in his own apartment, fully clothed, and not handcuffed, and he had been provided food and drink"). Further, the officers generally spoke in non-threatening, conversational tones throughout the interview. See United States v. Heller, 551 F.3d 1108, 1112 (9th Cir. 2009) (upholding district court's determination that the defendant's confession was voluntary in part because the interrogation environment was "friendly and cordial"). Moreover, defendant is neither particularly susceptible to coercion because of his age, nor does he suffer from any physical ailments that could have affected his decision to speak to the officers. See United States v. Male Juvenile, 280 F.3d 1108, 1022–23 (9th Cir. 2002) (courts may consider suspect's age in determining voluntariness); Rodriguez-Rodriguez, 364 F.3d at 1146 (consideration of suspect's physical condition). Taking all surrounding circumstances into account, the Court concludes that defendant made his statements voluntarily.[3]

---

[3] The Court is unpersuaded that the officers' references to defendant's immigration status rendered his statements involuntary. At one point, after establishing that defendant is not a United States citizen, SA Negrelli told defendant that "[i]f you lie to me, adios, amigo, back to Mexico. Okay? Now, I'm not threatening you, but I'm going to be able to help you, you can't bullshit me. You have to tell me the truth." Transcript at 48:23–49:1. First, and most

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CRIMINAL MINUTES - GENERAL

 The cases relied upon by defendant, <u>Collazzo v. Estelle</u>, 940 F.2d 411 (9th Cir. 1991) and <u>United States v. Harrison</u>, 34 F.3d 886 (9th Cir. 1994), do not compel a different result. In <u>Collazzo</u>, police officers told a Mirandized suspect who asked to speak to an attorney that "it might be worse for him" if he talked to an attorney prior to questioning and that "it was in his interest to talk to them without one." <u>Collazzo</u>, 940 F.2d at 413. Three hours later, the officers re-advised the defendant of his rights at which point the defendant agreed to speak with them. <u>Id.</u> The Ninth Circuit ruled that defendant's <u>Miranda</u> waiver and subsequent statements were involuntary because the officers "effectively told Collazo he would be penalized if he exercised rights guaranteed to him under the Constitution of the United States" after he had inquired about whether he should invoke his right to counsel. <u>Id.</u> at 417. In <u>Harrison</u>, after agents had read the defendant her <u>Miranda</u> rights, an agent asked her whether she thought "it would be better if the judge were told that she had cooperated or not cooperated." <u>Harrison</u>, 34 F.3d at 890. The defendant responded that it would be better if she talked to the agents and they told the judge that she had cooperated. <u>Id.</u> She then gave a statement to the agents. <u>Id.</u> The Ninth Circuit held that her waiver and statements were involuntary because "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment" because "[r]efusal to cooperate is every defendant's right under the fifth amendment." <u>Id.</u> at 891. The court emphasized that "[t]he improper conduct

---

importantly, that statement came roughly two-thirds of the way through the interview, after defendant had made inculpatory statements. Moreover, SA Negrelli clarified that "if you lie to me, the judge, the lawyers, they're not going to like that. I'm not going to like that. So if you're going to lie to me, I'll turn off this recorder . . . we'll pack our shit, and we'll go. Okay? Don't lie to me anymore." <u>Id.</u> at 49:13–18. Later, SA Negrelli again clarified that "[i]f you're going to talk to me . . . don't lie to me. If you don't want to talk to me, that's cool too." <u>Id.</u> at 53:6–9. Taken in context, it is clear that SA Negrelli was simply instructing defendant to tell the truth. Such actions are permissible under the Fifth Amendment. Indeed, courts routinely uphold confessions given even after an officer has actively lied to a defendant. <u>See, e.g.</u>, <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969) (reversing district court's decision to suppress statements made after officers lied to suspect by telling him that his cousin had admitted to the crime because "the fact that the police misrepresented the statements that [the defendant's cousin] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible"); <u>Holland v. McGinnis</u>, 963 F.2d 1044, 1051 (7th Cir. 1992) ("Such misrepresentations, of course, may cause a suspect to confess, but causation alone does not constitute coercion . . . the deception did not interject the type of extrinsic considerations that would overcome [defendant's] will . . . ."). The Court therefore concludes that SA Negrelli's comment about defendant's immigration status did not coerce defendant into making any inculpatory statements.

was the suggestion that [the agents] *might inform the court* that she had not cooperated." Id. (emphasis added).

The coercion present in Collazzo and Harrison—e.g., the officers' suggestions that invoking a constitutionally guaranteed right would harm the defendant in some way—is simply not present in this case. Unlike those cases, in which the coercive statements were made *after* the defendants had been read their Miranda rights, defendant had not been informed of his rights and did not question whether he should invoke those rights when SA Negrelli made the "fight" statement. To the contrary, the officers took significant steps to purge any coercive effects from the "fight" statement. Namely, officers explained, in both English and Spanish, each of defendant's Miranda rights. Defendant orally and in writing stated that he understood his rights. Defendant signed a waiver stating he waived his rights. SA Negrelli asked defendant twice whether defendant was willing to talk, and both times defendant said yes. Importantly, SA Negrelli reminded defendant of his rights during the interview on more than one occasion. See Transcript at 52:21–24 ("If you're telling me 'I want a lawyer,' I'm done. If you want to talk, that's okay too. But if say, 'Abogado now,' I'm done. Then I have no more questions."); 53:6–9 ("If you're going to talk to me . . . don't lie to me. If you don't want to talk to me, that's cool too."). Despite SA Negrelli's reminders, defendant continued to speak. Thus, any taint caused by SA Negrelli's "fight" statement was purged by the thorough explanation of defendant's rights in both English and Spanish, the reminders of his rights throughout the interview, and the generally casual tone used by the officers. The totality of the circumstances in this case therefore compel a different result than in Collazzo and Harrison. See Oregon v. Elstad, 470 U.S. 298, 303, 309 (1985) (reversing district court's suppression of statements because, although officers had unconstitutionally obtained a confession without giving Miranda warnings and then subsequently obtained a confession following Miranda warnings, the "sole" inquiry as to whether post-Miranda statements are admissible is whether the statements were "knowingly and voluntarily made"); Garvin v. Farmon, 258 F.3d 951, 956–58 (9th Cir. 2001) (concluding that a suspect's confession three days after unconstitutional coercion by police was not involuntary under the totality of the circumstances).

In accordance with the foregoing, the Court DENIES defendant's motion to suppress statements.

### III. DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The government conducted searches of defendant's digital media in September and October 2011 based on the following language of the original search warrant:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

> If, after conducting such an initial search [within 60 days from the date of the execution of the search warrant], the case agents determine that a digital device is an item to be seized or contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the digital device *for further analysis*; otherwise, the government will return the digital device.

Dkt. No. 36-2 at 64, ¶ v (emphasis added).

Defendant argues that the "for further analysis" language did not provide the government with "limitless authority to conduct unrestricted, repeated searches of every part of the digital media. . . ." Def. Mot. to Suppress Evid. ("10/26/11 Mot.") at 6. Defendant contends that the more reasonable interpretation is that the "further analysis" authorized by the warrant "refers to further analysis of the seizable data that was discovered during the 60-day period authorized for the initial search—rather than referring to an unlimited authority to search for *additional* seizable data more than two years after that 60-day period had expired." Id. at 7 (emphasis in original). Defendant notes that "even the government must have assumed this more narrow interpretation of the warrant, or else it would not have deemed it necessary to seek a second warrant to perform the subsequent searches. . . ." Id. According to defendant, "[a]t best, the terms of the warrant are ambiguous as to whether the subsequent searches were permitted," which should be construed against the party that drafted the warrant, or in this case, the government. Id. (citing United States v. Transfiguracion, 442 F.3d 1222, 1228 (9th Cir. 2006); Jones v. Wilhelm, 425 F.3d 455, 463 (7th Cir. 2005)). Finally, defendant argues that the rule of lenity supports construing the ambiguity in favor of defendant. Id. at 8.

In opposition, the government argues that the subsequent searches were authorized by the original warrant, and even if the subsequent searches were not authorized, "ample new probable cause existed to justify the issuance of a new search warrant for defendant's digital devices—thus, defendant has not been prejudiced by the government's new analysis." Gov't Opp'n to 10/26/11 Mot. ("10/31/11 Opp'n") at 1. The government contends that the subsequent searches were authorized by the original warrant because there was no time limitation on the "further analysis" of a device that had been found to contain contraband. Id. at 5. Further, the government contends its further searches are "consistent with analysis that the government routinely undertakes prior to trial with any other evidence or instrumentality of a crime." Id. at 7. According to the government, even if the original warrant did not authorize the subsequent searches, "there was ample probable cause to support the issuance of a new search warrant" due to the "thousands" of files depicting child pornography found during the initial search. Id. at 7–8. The government notes that it "has not attempted to search any new digital devices, nor has it attempted to search defendant's digital devices for evidence of any crimes other than those that were specifically articulated in the original Search Warrant." Id. at 4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

The Court finds that any evidence discovered during the September and October 2011 forensic searches is inadmissible. The original warrant's "further analysis" language is ambiguous as to whether it permits the government to analyze defendant's digital devices for additional evidence of contraband, or whether it merely permits additional analysis of previously discovered contraband. Given this ambiguity, suppression of the evidence is appropriate. See Transfiguracion, 442 F.3d at 1228 (construing ambiguities in plea agreements in favor of a defendant because the government, as drafter of the agreement, bears the "responsibility for any lack of clarity") (internal quotation marks and citation omitted); Wilhelm, 425 F.3d at 463 (finding fourth amendment violation because officer "recognized the warrant as ambiguous before the execution of the warrant, but failed to immediately stop execution and seek the necessary clarification of a warrant in order to make certain the warrant particularly described the place to be searched. . . ."). The Court's decision is informed by the fact that the government sought—and was denied—a new warrant from Judge Zarefsky, and thereafter sought ex parte relief from this Court before conducting the subsequent searches. At the very least, the government's conduct demonstrates its acknowledgment that the "further analysis" language is ambiguous. In denying the government's ex parte application, the Court directed the government to seek clarification from the issuing judge to cure any ambiguities. Because the government chose to proceed with the searches without clarification or without securing a new search warrant, that evidence must be suppressed. See Wilhelm, 425 F.3d at 463.[4]

Accordingly, defendant's motion to suppress evidence acquired as a result of the government's unlawful September and October 2011 searches is GRANTED.

## IV. GOVERNMENT'S MOTIONS *IN LIMINE*

### A. Motion *in Limine* to Admit Child Pornography Images and File Names and Publish Select Images to the Jury

The government seeks to introduce the following evidence at trial: (1) the thirty-five child pornography images specifically named in the indictment; (2) four images and five video clips in its case-in-chief; (3) evidence of the volume of child pornography found on defendant's digital devices; (4) evidence of the child pornography filenames; and (5) testimony from Officers Yoder, Vincent, and Crozier to testify about their investigations of the actual minors

---

[4] The Court declines to revisit the issue of whether the government had enough probable cause to support the issuance of a second search warrant in light of Judge Zarefsky's denial of the government's application.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CRIMINAL MINUTES - GENERAL

depicted in some of the charged images. Dkt. No. 46 at 3. The government seeks admission of this evidence to establish that the images are child pornography as legally defined, that defendant knowingly possessed the files, that defendant knew the images were made using real underage children, and that the defendant intentionally possessed these materials. Id. The government argues such materials should be admissible because, although prejudicial, they are directly related to carrying its burden of proof. Id. at 4. The government asserts that what it seeks to admit amounts to less than one percent of the child pornography found in defendant's home. Id. at 5. According to the government, appellate courts have repeatedly upheld admission of such evidence in these kinds of cases. Id. at 5–10 (citing United States v. Ganoe, 538 F.3d 1117, 1124 (9th Cir. 2008) (finding no abuse of discretion in admitting video and still images of child pornography); United States v. Polouizzi, 564 F.3d 142, 153 (2d Cir. 2009) (same); United States v. Burgess, 576 F.3d 1078, 1099–1100 (10th Cir. 2009) (same)).

In opposition, defendant argues that the Court should exclude this evidence because defendant has "offered to stipulate that all of the images listed in the indictment constitute child pornography as legally defined," that "any reasonable person who viewed the images—even momentarily—would know that the images showed actual minors engaged in sexually explicit conduct, and that the production of those images involved the use of actual minors engaged in sexually explicit conduct." Dkt. No. 59 at 3. According to defendant, his stipulation to those facts render the images and video inadmissible under Fed. R. Evid. 403. Id. at 4–5.

The Court finds that the proffered evidence is admissible. Defendant's attempt to stipulate to certain facts does not render the evidence inadmissible, because the government "is entitled to prove its case by evidence of its own choice, [and] a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." See Old Chief v. United States, 519 U.S. 172, 186 (1997). Courts have repeatedly rejected this tactic. United States v. Salcido, 506 F.3d 729, 735 (9th Cir. 2007); Polouizzi, 564 F.3d at 153 (holding that a defendant's "stipulation was not an adequate substitute for the evidence offered"); Burgess, 576 F.3d at 1099–1100 (upholding district court's determination to permit evidence of eight additional photographs despite the defendant stipulating to the pornographic nature of four others); United States v. Kennedy, 643 F.3d 1251, 1258 (9th Cir. 2011) (upholding district court's decision to admit testimony from five police officers that child victims were real minors despite the defendant's offer to concede "real children" element). See also Ganoe, 538 F.3d at 1124 ("The court is not required to scrub the trial clean of all evidence that may have an emotional impact.") (internal quotation marks and citation omitted); Old Chief, 519 U.S. at 187–88 (noting that the government's right to present evidence, rather than accept a stipulation, may establish the "human significance" of the facts and could "implicate the law's moral underpinnings" of the criminal prosecution).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

Because the government seeks to introduce only a limited number of photographs and videos from the collection as a whole, and because the government is not required to accept the offered stipulations, admission of the proffered evidence is not unduly prejudicial. Accordingly, the government's motion is GRANTED.

**B.    Motion *in Limine* to Admit Evidence Pursuant to Fed. R. Evid. 404(b)**

The government seeks to introduce the following three pieces of evidence pursuant to Rule 404(b):

- Evidence that on May 29, 2008, defendant used his own name, address, and credit card information to purchase a subscription to a website containing thousands of still images and videos of child pornography, and that defendant subsequently accessed and utilized that website;[5]
- Evidence that, in addition to the thirty-five files charged in the indictment, federal agents determined that two digital devices contained approximately 5,000 additional images and videos of uncharged child pornography; and
- Evidence that defendant, during execution of the search warrant, opened a locked safe in his home containing hard copy images of child pornography.

Dkt. No. 47 at 1.

The government seeks introduction of this evidence because "knowledge, intent, and identity could be at issue of this case" and that Rule 404(b) authorizes evidence of "other acts" to prove motive, intent, knowledge, identity, and absence of mistake or accident. Id. at 3. The government contends that "evidence of other crimes is inadmissible under [Rule 404(b)] only when it proves nothing but defendant's criminal propensities." Id. at 9 (quoting United States v. Sneezer, 983 F.2d 920, 924 (9th Cir. 1992)). The government argues Rule 403 is no bar to the proffered evidence's admissibility because its prejudicial impact does not substantially and unfairly outweigh its probative value. Id. at 10 (citing United States v. Johnson, 132 F.3d 1279, 1282 (9th Cir. 1997); United States v. Skillman, 922 F.3d 1370, 1374 (9th Cir. 1990)).

In opposition, defendant argues that the evidence is inadmissible under Rules 403 and 404(b). Dkt. No. 57 at 1. As to Rule 404(b), defendant argues that evidence of a website

---

[5]The government does not seek to introduce any images or videos from the website other than the redacted "join" page, but merely evidence that defendant knowingly and intentionally possessed the child pornography charged in the indictment.

subscription does not lead to any inference regarding defendant's knowledge of the charged images because "none of the latter were obtained through the website or in any way connected to it." Id. at 2–3. Moreover, defendant contends that "it is not clear that the images that could be accessed from that website are necessarily similar to the images charged in the superseding indictment against [defendant]." Id. at 3. As to Rule 403, defendant contends that the three proffered pieces of evidence should all be excluded because they would confuse the jury, highly prejudicial, and inflammatory. Id. at 4–9.

The Court finds that the proffered evidence is admissible under Rule 404(b). Evidence of a defendant's crimes, wrongs, or other bad acts may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Fed. R. Evid. 404(b). Rule 404(b) is an "inclusi[ve]" rule meaning "other acts evidence is admissible whenever relevant to an issue other than defendant's criminal propensity." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982). Accordingly, evidence is admissible under Rule 404(b) if it (1) tends to prove a material fact; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that the person committed the act; and (4) if admitted to prove intent or knowledge, the act is similar to that charged. United States v. Tsinnijinnie, 91 F.3d 1285, 1288–89 (9th Cir. 1996). Such evidence should be admitted "unless its prejudicial impact substantially outweighs its probative value." Johnson, 132 F.3d at 1282.

Here, evidence that defendant purchased an online subscription to a child pornography website and accessed the website multiple times is probative of his knowledge and intent in committing the charged crimes. It also serves to rebut any argument by defendant that the charged image files were saved on his digital media accidentally. Although the subscription was purchased approximately one year ago, the website was accessed several times thereafter and thus the evidence is not too remote in time. Moreover, the evidence's probative value is not substantially outweighed by unfair prejudice, because the government seeks to prove only that a subscription was purchased, and not admit any photos or videos from the website. Accordingly, the Court finds that the evidence is admissible. See United States v. Self, 2010 U.S. Dist. LEXIS 125149, *4–5 (D. Ariz. Nov. 12, 2010) (finding admissible evidence that defendant connected to a child pornography website as under Rules 404(b) and 403).

Evidence that defendant's digital media contained uncharged photographs and videos of child pornography is also admissible. It, like the website subscription, tends to prove that defendant knowingly possessed the charged child pornography and that he did not possess it by mistake. Further, because the evidence was discovered in conjunction with the charged images, it is not too remote in time. Finally, because the government seeks to introduce evidence only of the volume of images, and not the images themselves, the probative value is not substantially outweighed by the risk of unfair prejudice. Such evidence is routinely admitted under Rule

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CRIMINAL MINUTES - GENERAL**

404(b). See United States v. Riley, 342 Fed. Appx. 315, 318 (9th Cir. 2009) (upholding district court's decision to admit uncharged images from the defendant's computer because the images were "relevant to establishing [the defendant's] knowledge of the contends of the [charged images] and to demonstrating the absence of mistake"); United States v. Curtin, 489 F.3d 935, 950 (9th Cir. 2007); Self, 2010 U.S. Dist. LEXIS 125419 at *13–14; United States v. Schene, 543 F.3d 627, 643 (10th Cir. 2008) (affirming district court's decision to admit emails containing child pornography under Rule 404(b) to show defendant knowingly possessed charged images).

      Finally, the hard copy printouts of child pornography is also admissible because it tends to prove that defendant intentionally and knowingly possessed child pornography. It is not too remote in time as it was discovered contemporaneously with the charged images. Further, it is not unfairly prejudicial because the government intends to block out any images. As with the other proffered evidence, courts have allowed similar evidence to be admitted pursuant to Rule 404(b). See Curtin, 489 F.3d at 948–49 (upholding district court's decision to admit lewd stories describing sexual acts between adults and minors because such evidence was relevant to prove intent and lack of mistake); Self, 2010 U.S. Dist. LEXIS 125419 at *6–7 (admitting printouts found in the defendant's bathroom cabinet to prove knowledge).

      Accordingly, the government's motion *in limine* is GRANTED.

## V.    CONCLUSION

      In accordance with the foregoing, defendant's motion to suppress statements is DENIED. Defendant's motion to suppress evidence is GRANTED. The government's two motions *in limine* discussed herein are GRANTED.

      IT IS SO ORDERED.

| | 00 | : | 30 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |